REYNA, Circuit Judge,
dissenting.
The majority affirms a determination of the Civilian Board of Contract Appeals (“Board”) that Appellant TKC Aerospace, Inc. (“TKCA”) bore the responsibility for corrosion repair and aircraft downtime for a corporate jet that the U.S. Coast Guard leased from TKCA. Specifically, the majority holds that substantial evidence supports the Board’s determination that TKCA was liable for corrosion remediation maintenance expenses because the Coast Guard was not obligated under the contract to detect and prevent corrosion damage and, in any event, the damage fell outside the contract’s “risk of loss” provision as normal wear and tear. The majority also found substantial evidence supporting the Board’s conclusion that notwithstanding the Coast Guard’s failure to notify TKCA that downtime was accruing, TKCA had adequate notice to be held liable for the downtime. I disagree with the majority in all three respects. Because contract interpretation is an issue of law that this court reviews de novo, 41 U.S.C. § 7107(b)(1); Travel Centre v. Barram, 236 F.3d 1316, 1318 (Fed.Cir.2001), I conclude that the Board legally erred in interpreting the contract provisions concerning corrosion abatement expenses and sufficiency of notice. Accordingly, I respectfully dissent
I. Baokground
Under the contract, the Coast Guard could have required TKCA to perform all maintenance on the aircraft. Instead, the Coast Guard opted to save $14,375 per month and assumed responsibility for its personnel to perform the daily maintenance (known as line or unit-level maintenance).[1] TKCA remained obligated to perform depot-level maintenance at scheduled intervals.[2]
In furtherance of its unit-level maintenance obligations, Coast Guard represented in clause 5.7.1.2 of the contract that its aviation maintenance personnel are trained to perform ground handling and servicing of Coast Guard aircraft, including conducting routine and special aircraft inspections and related aviation administrative duties such as “corrosion control, preflight, thru flight, post flight” and other routine inspections. Joint App’x 217 (emphasis added).[3] Related to its representations, the *940 Coast Guard’s Aeronautical Engineering Maintenance Management Manual provides that the Coast Guard’s “Commanding Officers are responsible for the adequate maintenance and corrosion control of aircraft in their custody and are to impose such other inspection requirements as necessary to meet differing environmental and operation conditions as may exist.” Joint App’x 451. To fulfill this obligation, the Coast Guard designated specific personnel to serve as its “Corrosion Control Officer.” Additionally, the Coast Guard assumed all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the term of the lease while the aircraft was in possession of the Coast Guard and agreed that, in the event of damage to the aircraft, the Coast Guard would pay TKCA’s reasonable cost of repair of the aircraft. Joint App’x 201-02.
Under clause 5.17 of the contract, TKCA was obligated to maintain semi-annual operational availability of the aircraft in excess of 95% taking into account any unavailability due to maintenance, whether it be unit-level maintenance at the aircraft’s Air Station Washington home or depot level maintenance performed at Bombardier’s facilities elsewhere. See Joint App’x 220. Clause 5.17.5 of the contract provided that downtime would be measured from the time TKCA was notified by the Coast Guard Air Station Washington Maintenance personnel until the affected aircraft system was returned to Ready for Issue (RFI) status. Id.
During the first five years of the contract, few, if any, problems or disputes developed. In March 2008, during routine depot maintenance, an inspection uncovered corrosion damage on the seat track directly behind the galley bulkhead wall, the remediation of which required approximately $2,500 in repairs and did not result in appreciable downtime. As a result, TKCA assumed the cost of the repair. During the following year’s scheduled depot maintenance in December 2009, however, pervasive corrosion damage was discovered under the carpets in the forward, starboard part of the aircraft, near the galley bulkhead. The repairs required the aircraft to be taken out of service for an additional 33 days beyond the scheduled maintenance, and it was not returned to the Coast Guard until January 20, 2010. Due to the aircraft’s unavailability during this time, the contract’s mission readiness requirement of 95% was not met.
II. Discussion
Although there is evidence that the Coast Guard could have caused the corrosion when liquids would spill onto the galley floor from the sink and other sources or when water would reach the carpet through the open forward door, see Joint App’x 73, there is no reason upset the Board’s conclusion that the cause of the corrosion is undetermined. Joint App’x 7. *941 Instead, this case requires review of the contract provisions concerning which party was obligated to perform preventative corrosion maintenance under the contract and, in the event of widespread damage, which party bore the risk of loss resulting from such damage. Furthermore, it presents the issue of whether the contract required the Coast Guard to provide TKCA notice before downtime could begin accruing consistent with the parties’ mutual agreement. I address these issues in turn.
A. Corrosion Control '
As an initial matter, the majority concludes that TKCA had undertaken the obligation under the contract to detect and prevent corrosion. In doing so, it relies heavily on the fact that depot level maintenance was the responsibility of TKCA. Even though the Coast Guard was obligated to perform “routine” daily maintenance, the majority nonetheless affirms the Board’s conclusion that it was TKCA’s “responsibility to ensure that the aircraft was being properly maintained at all times.” Joint App’x 9 (emphasis added). I find legal error in the Board’s conclusion.
Under the terms of the contract, the Coast Guard could have opted to require TKCA to perform all maintenance, but instead, the Coast Guard elected to undertake the responsibility for performing daily maintenance. This included, but was not limited to, inspecting components and repairing or replacing damaged parts. The Coast Guard represented in provision 5.7.1.2 that its personnel were capable of performing a lengthy list of activities, most notably, corrosion control. As it turned out, Coast Guard personnel performed all of those activities, save a select few not relevant to this case. See supra note 3. As a matter of contract interpretation, there is legal error in the Board’s conclusions that TKCA was obligated to ensure that the aircraft was properly maintained at all times and that the Coast Guard only performed routine maintenance under TKCA’s supervision, direction, and control. Accordingly, I cannot agree with the majority’s affirmance of the Board’s conclusion that TKCA had undertaken the obligation under the contract to detect and prevent corrosion.
B. Risk of Loss
The majority affirms the Board’s conclusion that the risk of loss provision only applied to “accidental” damage and, therefore, not did not apply in this case because the corrosion damage was “simple wear and tear.” Joint App’x 10. I disagree.
Federal Acquisitions Regulation provision 3052.228-91, which was incorporated into the contract, provides that
[the Coast Guard] assumes all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the term of this lease while the aircraft is in possession of the [Coast Guard]. In the event of damage to the aircraft, the [Coast Guard], at its option, shall make the necessary repairs with its own facilities or by contract, or pay [TKCA] reasonable cost of repair of the aircraft.
Joint App’x 201-02. Nothing about the provision limits it to “accidental” damage. The Board erred when it imported this concept into the risk of loss provision. Here, the Coast Guard bore the risk of loss and damage to the aircraft it leased from TKCA regardless of the nature of the loss or damage as long as it was more than normal wear and tear. The majority finds substantial evidence supporting the conclusion that the corrosion damage was normal wear and tear. I disagree. It is unreasonable to conclude that a repair that requires the entire interior of an aircraft to be removed and an extensive amount of *942 man-hours and onsite component fabrication is a repair of normal wear and tear. The Board’s conclusion that the damage to the aircraft was normal wear and tear is unreasonable and not supported by the record, which instead demonstrates damage to the aircraft requiring significant repairs resulting in significant downtime. The majority incorrectly holds that substantial evidence supports the Board’s conclusion. See 41 U.S.C. § 7107(b)(2)(C). Because the damage was not normal wear and tear, it follows that the damage to the aircraft was the type of damage covered by the risk of loss provision.
C. Notice
Finally, the majority affirms the Board’s interpretation that the contract did not require the Coast Guard to provide TKCA with notice that downtime was accruing while the aircraft was undergoing depot maintenance and corrosion remediation at TKCA’s facility. The majority does so notwithstanding the Board’s erroneous view that downtime assessments involve an after-the-fact analysis and are “retroactive” in nature. Joint App’x 10. The majority also affirms the Board’s interpretation that the contract only requires actual notice when the aircraft is “down” at the Coast Guard’s Air Station Washington home or at some other location presumably because TKCA would potentially not be aware of the aircraft’s unavailability. Id. This interpretation of the contract’s notice requirement is erroneous because it overlooks that the notice provision is intended to start the clock to measure accrued time, not simply acknowledge that the aircraft is down.
I find that the notice requirement is used to measure accrual of time that the aircraft is unavailable and not to simply alert TKCA that the aircraft is down, a factor TKCA would presumably know given its responsibility for depot level maintenance. In pertinent part, provision 5.17.5 provides that “[t]he Coast Guard and [TKCA] have mutually agreed that downtime will be measured from the time [TKCA] is notified by the Coast Guard Air Station Washington Maintenance personnel until ... [t]he affected aircraft system is returned to Ready for Issue (RFI) status.” Joint App’x 221. The Board and the majority overlook the parties’ mutual agreement that downtime would only begin accruing once the Coast Guard provided notice to TKCA of the accruing downtime. There is nothing in the notice provision that makes it inapplicable should TKCA be aware on its own that the aircraft is “down” or otherwise undergoing service or repair. As it is, TKCA authorized overtime and night-shift/weekend support to accelerate the corrosion remediation. Had the Coast Guard notified TKCA that it potentially faced liability for the downtime, TKCA may have been compelled to authorize additional overtime, especially since the repairs occurred during the holiday season, in order to limit potential liability.
The Coast Guard argues that, even if notice was required, TKCA had actual notice that the aircraft was “down.” The Coast Guard relies on a passage cited by the Board, which indicated that the parties “agreed that corrosion repairs should be started immediately while the aircraft was at the Bombardier maintenance facility to minimize downtime and cost for repairs.” Joint App’x 10. At best, this reliance amounts to post-hoc rationalization. This passage is taken from TKCA’s claim letter, which was sent after the Coast Guard had already withheld invoice payments due to unscheduled downtime. The passage exemplifies the “after-the-fact analysis” of downtime erroneously endorsed by the Board. If the Coast Guard had adequately notified TKCA that it could be facing downtime, TKCA could have taken steps *943 to limit its liability from the beginning. Because the Board erred in finding the Coast Guard’s constructive notice to TKCA adequate, I conclude that the Board improperly assessed a penalty against TKCA for unnoticed downtime.
III. Conolusion
As set forth above, I conclude that the risk of loss provision obligated the Coast Guard to cover the corrosion repair cost and that the Coast Guard failed to provide adequate notice that downtime had begun accruing while the repairs were underway. From the majority’s contrary conclusions, I respectfully dissent.

. According to Coast Guard’s Aeronautical Engineering Maintenance Management Manual, COMDTINST Ml 3020. IF, unit-level maintenance normally consists of "inspecting, servicing, lubricating, adjusting, and replacing components, minor assemblies, and su-bassemblies. It also consists of calibrating, repairing or replacing damaged or unserviceable parts, components, and assemblies; modifying materiel, emergency manufacturing of unavailable parts; and developing/providing internal technical assistance." Joint App’x 449.

. By contrast, depot level maintenance “usually consists of repairing, modifying, overhauling, reclaiming, or rebuilding parts, assemblies, subassemblies, components and end items; emergency manufacturing of unavailable parts; and providing extensive, detailed technical assistance to using activities.” Id. at 449-50.

.In pertinent part, clause 5.7.1.2 also provides:
Coast Guard Air Station Washington aviation maintenance personnel are trained to perform ground handling and servicing of Coast Guard aircraft. They conduct routine and special aircraft inspections and related aviation administrative duties.... Aviation Maintenance Technicians (ATM Rate) service and *940 maintain aircraft bleed air, hydraulic and fuel systems, aircraft engines, auxiliary power units, and power train systems. They also maintain, and can conduct minor repairs on aircraft fuselage, wings and fixed and movable flight control surfaces. Some of the duties performed by Air Station Washington maintenance personnel include corrosion control, preflight, thru flight, post flight, and other routine inspections; organizational level on-equipment maintenance, servicing and routine checks, including removal and replacement of components and minor repairs on installed engines and Auxiliary Power Units (APUs); limited off-equipment maintenance capability, including, but not limited to: testing of selected LRUs, tire build-up, interi- or refurbishment, strut removal and replacement, and repair of water and latrine systems. During performance of the contract, the Coast Guard performed all of the tasks mentioned above except testing the LRUs, performing tire build-up, and removing and replacing the struts. Joint App’x 93.